**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **Case No. 24-cv-2001** |
| Plaintiff, | |
| | **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |
| v. | |
| BIZ2CREDIT, INC., a Delaware corporation, and | |
| ITRIA VENTURES LLC, a Delaware limited liability company, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Sections 5(a)(1), 13(b), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a)(1), 53(b), and 57b, and the COVID-19 Consumer Protection Act, Public Law 116-260, 134 Stat. 1182, Title XIV, Section 1401 ("CCPA"), which authorize the FTC to seek, and the Court to order permanent injunctive relief, monetary relief, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) and in violation of the CCPA.

1

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the CCPA, Public Law 116-260, 134 Stat. 1182, Title XIV, Section 1401.

## DEFENDANTS

5.      Defendant Biz2Credit, Inc. ("Biz2Credit"), is a Delaware corporation with its principal place of business at One Penn Plaza, Suite 3130, New York, NY.  Biz2Credit transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, Biz2Credit has advertised, marketed, offered, or distributed financing to small businesses throughout the United States.

6.      Defendant Itria Ventures LLC ("Itria") is a Delaware limited liability company with its principal place of business at One Penn Plaza, Suite 3130, New York, NY.  Itria is a wholly owned subsidiary of Biz2Credit.  Itria transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in

2

concert with others, Itria has advertised, marketed, offered, or distributed financing to small businesses throughout the United States.

## COMMON ENTERPRISE

7.      Defendants Biz2Credit and Itria (collectively, the "Defendants") have operated as a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of law alleged below.  Defendants have conducted the business practices described below through interrelated companies that have common ownership, officers, managers, business functions, employees, and office locations.  Because these Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

8.      At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### Background on SBA's
### Paycheck Protection Program

9.      The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, was enacted to provide immediate, emergency assistance to individuals and businesses affected by the COVID-19 pandemic.  Under the CARES Act, eligible small businesses could obtain forgivable loans under a temporary, emergency Small Business Administration ("SBA") loan program called the Paycheck Protection Program ("PPP" or "Program").

10.      PPP loans were designed to help small businesses that were struggling, because of the pandemic, to keep their workers on payroll, as well as cover mortgage interest payments,

rent, utilities, and other essential expenses.  Many small businesses that applied for PPP loans desperately needed immediate funds to stay afloat.

11.    Additionally, unlike most loans, PPP loans could be forgiven if the small business owners used the loan proceeds for payroll costs and other eligible expenses — thus effectively transforming the loan into a free federal grant.

12.    Lenders authorized by SBA to originate PPP loans could submit consumers' applications to SBA, which would then assign each application a reference number, called an "e-tran" number.  Once SBA assigned a consumer an e-tran number, the consumer was restricted from submitting additional applications to other PPP lenders — unless the first lender withdrew the consumer's application.  Lenders received fees from SBA for every PPP loan they successfully processed.

13.    The PPP was an extraordinarily time-sensitive program, operating on a first-come, first-served basis.  When the Program ran out of funds in May 2021, SBA ceased accepting new PPP loan applications.

### Overview

14.    Defendants run an online small business financing operation that advertises a variety of financing products.  Between at least May 2020 and May 2021, Defendants advertised, marketed, and offered PPP loans to struggling small business consumers in need of immediate funds as a result of the COVID-19 pandemic.  Defendants originated these loans through their lending arm, Defendant Itria.  In 2021, Defendants quickly rose to become one of the ten largest PPP lenders in the entire U.S., accepting a total of over 500,000 applications in the first 5 months of that year.

15.    Defendants engaged in a pattern of deceptive and unfair conduct.  They falsely touted that they would process consumers' applications within an average time frame of "10-12 business days" or, in some instances, "12-14 business days."   In fact, Defendants' application processing was riddled with delays, and the average processing time was *double* what Defendants claimed, with tens of thousands of consumers waiting over *two months* for a final determination.  Many of Defendants' applicants never received funding at all.  Defendants also blocked consumers from withdrawing their applications so that they could apply to other lenders — frequently ignoring consumers' repeated and urgent pleas to do so.

**<u>Misrepresentations Regarding<br>the Speed of the Application Processing</u>**

16.    Since at least February 2021 until at least May 2021, Defendants disseminated advertisements for PPP loans, or otherwise made statements to consumers, that claimed consumers' applications would be processed in a specific period of time.

17.    For example, Defendants represented to consumers on their website, www.biz2credit.com, "Average processing time: <u>12-14 business days</u>":



**Exhibit A**

**Apply direct for PPP** ✕

**Biz2Credit is helping business owners submit loan applications for the Paycheck Protection Program for first and second draw loans.** The SBA is issuing a significant number of validation requests (also known as error codes) on a high volume of loan applications. Already submitted applications are prioritized.

**Do Not Apply if you already applied with another lender.**
**Average Processing Time: 12-14 Business Days**

**CONTINUE TO SITE**

Paycheck Protection Program subject to
availability and guidance issued by the SBA.

**Exhibit B**

18.     In webinar slide presentations to consumers, Defendants made similar claims regarding the number of days it would take to process consumers' applications:



**Exhibit C**



**Exhibit D**

19.     Additionally, Defendants represented in numerous email communications with consumers that:  "Current wait times are between 10-12 business days."  Defendants also sent mass email messages to accountants who were assisting small business owners stating, "New loan submissions should anticipate processing times of 12-14 business days from date of submission."

7

20.     Unfortunately for applicants, Defendants' representations in Paragraphs 17 through 19 that consumers' applications would be processed within an average 10-12 or 12-14 business days were false.  In reality, Defendants' application processing was riddled with delays, technical errors, and other problems — jeopardizing the hundreds of thousands of applications they had accepted and *continued urging* consumers to submit.

21.     Contrary to Defendants' timing claims, consumers waited an average of more than a month (25 business days) for Defendants to make a final determination on their loan applications.  This was roughly *double* the time Defendants promised in their advertisements.  Additionally, tens of thousands of consumers waited over *two months* for a final determination from Defendants.

22.     Even consumers who were approved and received loan funds from Defendants had to wait, on average, at least 50% longer (17 business days) than Defendants had often promised.  And ultimately, roughly 40% of Defendants' consumers had their applications cancelled or rejected (by far, the highest rate of any of the other ten largest PPP lenders) — leaving them without any funding from Defendants at all.

23.     Despite these delays, and Defendants' knowledge of them, Defendants continued to make their false timing claims to consumers to solicit PPP loan applications until nearly the end of the Program.

24.     These false claims of fast processing were critical for consumers because of the extraordinarily time-sensitive nature of the Program, and the fact that Defendants' applicants were restricted from applying for PPP loans with other lenders.  Given that the PPP was a temporary program that ended when loan funds ran out in mid-2021, many consumers subjected to these delays lost their opportunity to obtain PPP loans entirely, and suffered damages as a

result.  Further, even to the extent some consumers eventually obtained PPP loans from Defendants, in numerous instances, these delays damaged struggling small businesses by depriving them of emergency funds they needed more immediately and could have obtained through other lenders not making false claims about their processing times.

25.    In many cases, during these delays, Defendants failed to provide consumers with updates regarding their applications, or to respond to consumers' basic questions or complaints. For example, one consumer reported:

> Biz2Credit approved a . . . PPP loan for my restaurant back in February [2021].  As of today [May 6], we are still waiting for funds to be deposited into our bank account. . . . We are in desperate need of these funds. . . . The last time we heard from the[m] was [March 31].  Since then all of our messages have gone unanswered.

Another consumer complained to Defendants that:

> I applied for [a] PPP loan with Biz2credit . . . believing loan process would take 12-14 days as stated on Biz2credit website. After 56 days I've yet to receive the funds nor any meaningful assistance.

In fact, a Biz2Credit employee admitted, during a presentation, that "we do not have the capabilities to assist anyone individually . . . because we have so many businesses that are applying."

26.    Defendants knew they were accepting more applications than they could successfully process within the time frame they touted to consumers.  For example, internal emails in mid-February 2021 state that "[w]e are drinking from the SBA firehose and our backlog is increasing every day," which caused Defendants to stop accepting loan applications for one weekend.  After that short pause, however, Defendants decided to "open the application intake" again.  Indeed, very shortly after Biz2Credit re-opened its application intake, SBA began to send Defendants emails notifying them that Biz2Credit had been flagged as having an

9

"elevated number of loans in undisbursed status."  Despite all of this, Defendants continued inviting the "firehose" of applications and making their false timing claims to consumers.

27.    Defendants also knew that consumers were misled by their claims that loan applications would be processed within an average of 10-12 business days or 12-14 business days.  For example, in a February 25, 2021 email sent to Defendants, a consumer complained that:

> [Y]our website says that processing time takes 12-14 days, but it's already passed a month since I applied, then about two weeks ago I've received a message that [the] application has been accepted by the SBA and funds are resolved, and since that moment I haven't heard anything from you guys.  Just I'm checking out if you are still working on it or I need to apply with some other lender, because I am worried now, it's only a month remaining until the ppp program ends.

Similarly, in a March 8, 2021 email to Defendants, a small business owner stated he "submitted the PPP application on 1/30/2021 and your website says one can expect an average wait time of 12-14 business days. We are now at business day 25. … I have heard nothing since 2/25/2021."

**Unfairly Blocking Consumers from
Applying to Other Lenders**

28.    In addition to misrepresenting the time it would take to process consumers' loan applications, Defendants often did not allow consumers to withdraw their applications, despite repeated, desperate pleas from many consumers to do so.  As a result, Defendants delayed or prevented these consumers from seeking and obtaining PPP funds from another lender.

29.    Defendants designed their application process to lock in as many consumers as possible and to block those consumers from applying to other lenders.  They did so by rapidly accepting hundreds of thousands of applications and immediately obtaining SBA e-tran numbers for those applications before engaging in any real underwriting.  For example, early on in the PPP, internal emails stated that Defendants needed "to change our user experience" to "block"

10

consumers' e-tran numbers (*i.e.*, to obtain these numbers in order to restrict consumers from applying with other lenders) before reviewing consumers' documents or other information necessary to underwrite the applications.  In response, Defendants circulated a proposed online application process that allowed Defendants to "block the user's E-Tran number quickly."

30.    In numerous instances, during the long delays and lack of communication described in Paragraphs 20 through 27 above, consumers requested that Defendants withdraw their applications so that they could seek a PPP loan from another lender.  However, Defendants often ignored consumers' withdrawal requests.  For example, one consumer complained to the company:

> I've tried emailing funding specialists, asking them to withdraw my application and notify the SBA, but they have not.  This means I still have an E-tran number from the SBA until [Defendants] decide[] to tell them to cancel it, and that means I can't apply with another lender. I'm basically trapped with this company that rarely responds.

Another desperate consumer complained in late March 2021 to Defendants:

> I applied for a PPP Loan with Biz2Credit on Feb 17, [2021].. . . I received my SBA ETRAN number on Feb 18th and uploaded all of my required documentation . . .. From that point on I received ABSOLUTELY NO COMMUNICATION from this company. I have emailed on numerous occasions to different support emails. Called the company but no-one answers, just says to email and then hangs up. . . . The[y] won't fund my loan, and they are holding me hostage because they have my loan so I cannot fund with someone else.

31.    Defendants blocked consumers from withdrawing their applications and applying elsewhere, and were aware of the harm caused by this conduct.  For example, one consumer complained to Defendants:

> We have asked to withdraw this application so many times.  It has been over a month, and we don't understand why the loan is still active with SBA. …You are preventing us from getting the help that is crucial to our business.

Only after SBA flagged this specific complaint to Defendants did they finally withdraw this consumer's application.

**VIOLATIONS OF THE FTC ACT**

32.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

33.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

34.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

**Count I**

**False, Misleading, or Unsubstantiated Claims Regarding
Application Processing Time**

35.     In numerous instances in connection with the advertising, marketing, promotion, or offering of PPP loans, Defendants have represented, directly or indirectly, expressly or by implication, that consumers' applications would be processed within an average timeframe of "10-12 Bus. Days" or "12-14 business days."

36.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 35, such representations were false or misleading, or were not substantiated at the time the representations were made.

37.     Therefore, Defendants' representations as set forth in Paragraph 35 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II

## Unfairly Blocking Consumers from
## Applying with Other Lenders

38.    In numerous instances, Defendants have failed to withdraw or cancel consumers' applications for PPP loans, despite consumers' requests to do so, and, as a result, prevented or delayed consumers from applying with other lenders.

39.    Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

40.    Therefore, Defendants' acts or practices as described in Paragraph 38 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and 45(n).

## THE COVID-19 CONSUMER PROTECTION ACT

41.    Enacted on December 27, 2020, the CCPA makes it unlawful, for the duration of the public health emergency declared on January 31, 2020 pursuant to Section 319 of the Public Health Service Act, for any person, partnership, or corporation to "engage in a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the [FTC] Act (15 U.S.C. 45(a)) that is associated with . . . a government benefit related to COVID–19." Pub. L. No. 116-260, 134 Stat 1182, Title XIV, Section 1401(b)(2).

42.    The PPP was a government benefit related to COVID-19.

43.    The CCPA provides that "[a] violation of subsection (b) shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under Section 18(a)(1)(B) of the [FTC] Act," 15 U.S.C. § 57a(a)(1)(B). Therefore, through Section 19(b) of

the FTC Act, the CCPA authorizes this Court "to grant such relief as the court finds necessary to redress injury to consumers," including "the payment of damages." 15 U.S.C. § 57b(b).

44.    Defendants' violations of the CCPA were committed during the public health emergency.

## Count III

### Misrepresentations Associated with a Government Benefit Related to COVID-19

45.    In numerous instances in connection with the advertising, marketing, promotion, or offering of PPP loans, Defendants have represented, directly or indirectly, expressly or by implication, that consumers' applications would be processed within an average timeframe of "10-12 Bus. Days" or "12-14 business days."

46.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 45, such representations were false or misleading, or were not substantiated at the time the representations were made.

47.    Therefore, Defendants' representations set forth in Paragraph 45 constitute deceptive acts or practices associated with a government benefit related to COVID-19.

## CONSUMER INJURY

48.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the CCPA.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

14

## PRAYER FOR RELIEF

49.    Wherefore, the FTC requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

B.  Award monetary and other relief within the Court's power to grant; and

C.  Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:  March 18, 2024

 /s/  *Evan R. Zullow*
EVAN R. ZULLOW (*pro hac vice* to be filed)
(ezullow@ftc.gov)
WENDY MILLER
(wmiller@ftc.gov)
JAMES DOTY (Bar No. JD1981)
(jdoty@ftc.gov)
Federal Trade Commission
600 Pennsylvania Ave. NW
Mail Stop CC-10232
Washington, DC 20580
Tel: 202-326-2914 (Zullow)
202-326-3571 (Miller)
202-326-2628 (Doty)
Fax: 202-326-2752

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION